## KTG Hospitality, LLC v World Class Constr. Inc.

2024 NY Slip Op 32991(U)

August 23, 2024

Supreme Court, New York County

Docket Number: Index No. 650482/2017

Judge: Andrea Masley

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT:   HON. ANDREA MASLEY

*Justice*

-------------------------------------------------------------------------------X

KTG HOSPITALITY, LLC,

                             Plaintiff,

                       - v -

WORLD CLASS CONTRUCTION INC., and YACOT
MANAGEMENT INC.,

                             Defendants.

--------------------------------------------------------------------------------X

PART _____48_____

INDEX NO. _____650482/2017_____

This is a breach of contract action arising from the construction of a restaurant - The Wall Street Grill - at 75 Wall Street (Project). For the following reasons, the court finds in favor of plaintiff KTG Hospitality, LLC (KTG) on its change order claims for $144,500 ($15,600+ $12,000+$116,900) and in favor of defendants World Class Construction Corp. (WCC) and Yacot Management, Inc. (Yacot) in the amount of $263,608.31 for labor and materials paid for by defendants and for which KTG promised to reimburse WCC.[1] Defendants' claim against third-party defendant Cobra Kitchen Ventilation, Inc. (Cobra) is dismissed.

## Procedural History

On January 27, 2017, plaintiff KTG initiated this action for breach of contract, fraud, and unjust enrichment against defendants the general contractor WCC and Yacot, a construction management company related to WCC. (NYSCEF Doc. No.

---

[1] This decision was delayed by the parties' failure to comply with Part 48 procedures and common sense. The trial exhibits are not filed in NYSCEF. The parties failed to inform the court that both (1) the trial transcripts were available and (2) findings of fact were exchanged and filed in NYSCEF.

# OTHER ORDER – NON-MOTION

[* 1]

[NYSCEF] 1, Summons and Complaint at ¶6-10.)

WCC brought a counterclaim against KTG for breach of contract and alleges damages from unreimbursed expenses in the amount of $868,145. (NYSCEF 3, Answer and Counterclaim at 4-7.) WCC also brought a third-party action against the HVAC subcontractor Cobra for breach of warranties, express and implied, breach of contract, and negligence and seeks damages and attorneys' fees. (NYSCEF 31, Third Party Complaint at 7-13.)

In January 2017, WCC filed a notice of a mechanic's lien for unpaid labor and materials in the amount of $868,145 for work performed between October 1, 2015 and November 16, 2016 for which Fhima, or one of his entities, paid on behalf of KTG or remained unpaid. (Exhibit 4, Mechanic's Lien.) [2] On February 23, 2017, WCC filed a lien foreclosure action against the property owner 75 Wall Retail, LLC and KTG Hospitality LLC et. al (Index No. 650937/2017). Judge Schecter denied KTG's motion to dismiss and directed KTG to answer. (Index No. 650937/2017, NYSCEF 16.) It was consolidated with this action. As required by its lease, KTG bonded the lien paying annually $19,099 for which it seeks reimbursement from defendants here. (NYSCEF, 120, KTG's Memo of Law at 5/16[3].)

**Contentions**

KTG contends that WCC did not devote sufficient attention to this project, failed to keep KTG informed, inflated costs, and attempted to charge KTG for items such as office rent and management fees for which there was no agreement. (NYSCEF 112,

_____

[2] The parties consented to joint exhibits 1 to 122 going into evidence.
[3] NYSCEF pagination.

[* 2]

Traube[4] aff ¶¶10,12-14, 23, 44.)  KTG contends that, under WCC's supervision and control, Cobra installed multiple HVAC units that were contrary to code, not properly vented, without any access point for repair or service, and otherwise not functional for the space it occupied.  (*Id.* ¶11.)  WCC also allowed its subcontractors to perform work that was done illegally, improperly, contrary to code, not according to the structural plans, and without a proper inspection by an engineer.  (*Id.*)  WCC also directed Cobra to perform structural welding work even though Cobra was not licensed to do so.  (*Id.* ¶10.)

Traube challenges Fhima's spreadsheet of labor and materials as grossly inflated.  (NYSCEF 112, Traube aff ¶¶12-18, 20-21; NYSCEF 168, Traube tr 74:10-83:20.)  KTG argues that some expenses should not be allocated to KTG because WCC incurred them for other projects.  Traube insists that WCC's documentation does not support Fhima's claim for $909,936.  (NYSCEF 175, WCC Findings of Fact; See NYSCEF 169, Fhima tr 568:20-582:24; NYSCEF 170, Fhima tr 630:8-633:21; 635:9-683:21; 864:3-915:5.)  For example, KTG points to WCC's payment documentation which mixes Fhima's personal expenses (wine) and construction expenses; does not identify personal accounts from corporate accounts; includes payments for other construction projects; and includes payment from his various companies without explanation of their respective accounts, advances, or transfer of funds.  (See Traube aff ¶¶ 14 -18; NYSCEF 169, Fhima tr 568:20-582:24; NYSCEF 170, Fhima tr 635:9 -681:21; 864:3-915:5; NYSCEF 169 Fhima tr 567:7-12.)  KTG objects to reimbursing WCC for expenses paid by WCC's principal Fhima and his company IF Equities (IFE),

---

[4] Steven Traube is KTG's principal.

neither of which is a party to this action. (NYSCEF 120, KTG Pre-Trial Memo at 10-15.)[5] KTG allegedly terminated WCC for poor quality work, no plan to complete the project, and poor bookkeeping. (*Id*. at 3.) Traube complains that it took several months to investigate WC's deficient construction work and to remedy it, which delayed the project and delayed the opening of the restaurant, all at cost to KTG. (NYSCEF 112, Traube aff ¶¶38-39; NYSCEF 168, Ngai[6] tr 355:6-20; NYSCEF 169, Kaufman[7] tr 408:25 – 409:24.) KTG seeks damages in the amount of $365,300[8] for remedial costs and attorneys' fees, vacating WCC's mechanics' lien, and dismissal of WCC's counterclaims. (NYSCEF 177, KTG Findings of Fact at 7.) [9]

Defendants contend that the scope of work changed during the Project, forcing

---

[5] The parties reference deposition testimony in their pre-trial memos of law, without any citations to the depositions i.e. NYSCEF number, page and line.

[6] Carey Ngai is the structural engineer.

[7] Jeffrey Kaufman manages GAR, the general contractor that substituted for WCC after Traube terminated WCC.

[8] KTG's damages are based on 3 change orders: $15,600 + $280,800 + $116,900 - $48,000 = $365,300. (Exhibit 38, Change Orders at 378-385.)

[9] For its proposed Findings of Fact, KTG redesignated the trial exhibits instead of using the trial exhibit numbers. The court has no way of knowing whether these exhibits were entered into evidence at trial. Further, KTG uses letters instead of numbers to identify documents for this request contrary to Part 48 procedures. KTG's failure to follow Part 48 procedures in its Memo of Law on the lien delayed this decision.

WCC to cover expenses that were not planned. (NYSCEF 126, Fhima[10] aff[11] at 5, 6;[12] NYSCEF 121, WCC's Pre-trial Memo of Law at 5.) Defendants challenge KTG's damages as caused by KTG's changing plans and not WCC's performance. (NYSCEF 126, Fhima aff at 5, 6.) Fhima opines that WCC's termination was triggered when Fhima informed KTG's investors of the actual budget for the Project. (*Id*. at 6.) WCC insists that KTG terminated WCC to avoid reimbursing WCC for construction expenses as required by the parties' agreement. (*Id*. at 7.) WCC seeks reimbursement for the cost of labor and materials that WCC paid on KTG's behalf consistent with the agreement. (*Id*. at 7-8.) WCC's alleged damages are $909,936.[13] (NYSCF 175, WCC Findings of Fact ¶6; NYSCEF 166 Defendants' Memo of Law, Attachment A.)

Defendants do not seek any damages in the third-party action against Cobra

---

[10] Isaac Fhima is WCC's and Yacot's principal.

[11] WCC fails to designate paragraphs numbers in Fhima's trial affidavit and thus any references to this affidavit are to the pages. WCC's omission forced the court to waste time searching the document to find WCC's assertions therein and delayed this decision. Annexed to the Fhima affidavit is one exhibit. WCC failed to put any other documents in evidence with the Fhima trial affidavit which is one of its purposes at trial. Instead, WCC put in a "supplemental affidavit" with a list of documents that are allegedly referenced in the Fhima affidavit and for which the Fhima affidavit serves as foundation. (NYSCEF 143.) However, the supplemental affidavit is useless and in violation of this court's order to annotate the Fhima affidavit with related exhibits that WCC seeks to admit in evidence with the Fhima affidavit. (NYSCEF 167, tr 8:11-10:11; NYSCEF 169, tr 494:14-22.) No exhibits were admitted to evidence with this affidavit or its supplement, except if used at trial and entered into evidence.

[12] Fhima's trial affidavit was filed twice. Both times, the exhibits are labeled with letters, not linked to the trial exhibits and uselessly, and in violation of Part 48 procedures, the labels are the exhibit letter e.g. exhibit B, exhibit C. It is impossible to look in NYSCEF and discern the contents of the exhibit. WCC could not have made it more difficult for the court to draft this decision and delayed this decision.

[13] WCC's damages, listed on an attachment to WCC's Findings of Fact, sum to $714,950.56, which is inconsistent with Exhibit A to Fhima's trial affidavit which sums to $868,145. (NYSCEF 126, Fhima aff.) As Fhima's list has no back up, the court rejects it and relies on the list attached to defendants' Findings of Fact which are supported by the checks and credit card payments in evidence.

except indemnification if KTG is successful on its claim against WCC arising from Cobra's HVAC installation. (NYSCEF 175, Defendants' Findings of Fact; NYSCEF 31, Third Party Complaint at 12-13/42[14])

Cobra seeks dismissal of the third-party action against it because it followed the plans it was given and WCC's instructions. (NYSCEF 178, Cobra Findings of Fact.)

**The Trial**

At a six-day trial, the following witnesses testified: KTG offered the testimony of its principal Steven Traube,[15] Carey Ngai, the structural engineer, and Jeffrey Kaufman, who worked for the new contractor Great American Restoration (GAR) that replaced WCC. WCC's Fhima, Peter Kanakos, the mechanical engineer, and Steve Wygoda, the architect, testified for defendants. Peter Corba testified for Cobra.[16]

KTG engaged the professionals to renovate the premises. (NYSCEF 112, Traube aff ¶8.) The architect was SWA Architecture whose principal was Wygoda. (*Id*.) The mechanical, electrical, and plumbing engineer (MEP) was GC Eng & Associates whose owner is Kanakos. (*Id*.) The structural engineer was Carey Ngai Consulting Engineer PLLC. (*Id*.) These professionals as well as the electrician, plumber and other

---

[14] NYSCEF pagination.

[15] Traube's trial affidavit is designated Court Exhibit 1 and is in evidence except for paragraphs 43, 55, 56, 57 concerning bond payments which were stricken because the court dismissed KTG's request for the amount it paid to bond the lien. (NYSCEF 167, Traube tr 45:18-46:21.) WCC requested discovery concerning KTG's damages, but KTG did not list reimbursement of bond fees as damages. (*Id*. 45:22-46:2.) Rather, KTG's request for reimbursement of bond fees appeared for the first time in its pre-trial memo of law. (NYSCEF 120, Memo of Law at 5.)

[16] Transcripts are filed in NYSCF as follows: Traube testified on September 19 (NYSCEF 167); Ngai testified on September 20 (NYSCEF 168); Kaufman and Fhima testified on September 21 (NYSCEF 169); Fhima and Kanakos testified on September 22 (NYSCEF 170); Wygotta and Fhima testified on September 23 (NYSCEF 171); Cobra testified on September 28 (NYSCEF 172).

[* 6]

consultants constitute the design team. (NYSCEF 168, Ngai tr 220:22-221:2.) Wygoda, Traube and Fhima had worked together on two prior restaurant projects. (NYSCER 171, Wygoda tr 824:23-825:5.)

KTG is the lessor of the premises which consist of a two-story building, which is fronted on Wall Street and State Street. (NYSCEF 112, Traube aff ¶3; NYSCEF 167, Traube tr 64:22, 25, 84:14; NYSCEF 171, Wygoda 801:22-802:23.) The premises are part of a large hotel complex with a residential tower, the Hotel Hakimian, which overlook the roof of the Project; a three level parking garage is located underground below the Project. (NYSCEF 171, Wygoda tr 813:7-15.) The dining room and kitchen on the second level measure about 2,400 square feet. (NYSCEF 171, Wygoda tr 840:17-19.)

KTG and Fhima came to an agreement in February 2015. (NYSCEF 99, Fhima aff ¶1.) There is no written contract. Traube testified that Fhima agreed to work for the cost of labor and materials –without any compensation. (NYSCEF 112, Traube aff ¶¶ 4-7; NYSCEF 167, Traube tr 58:17-24.) There was no mark-up. To Traube, this meant Fhima would hire subcontractors and pay them and for materials and when Fhima submitted proof of an expense, KTG would reimburse WCC. (NYSCEF 112, Traube aff ¶¶ 6-7; NYSCEF 167, Traube tr 60:25-61:13) Indeed, KTG reimbursed WCC $364,000[17] for labor and materials before WCC was terminated in November 2016. (NYSCEF 167, Traube tr 62:16-25; NYSCEF 170, Fhima tr 624:15-625:2.)

Fhima corroborated that the agreement was for WCC to build the restaurant at

---

[17] Of the $364,000, KTG paid Yacot $76,000. (NYSCEF 31, Third Party Summons at ¶8 of KTG's Verified Bill of Particulars at 36/42.) WCC's failure to file exhibits separately, a violation of Part 48's procedures, delayed this decision.

cost for which WCC would be reimbursed. (NYSCEF, 126 Fhima aff at 2; NYSCEF 169, Fhima tr 538:18-546:7.) Fhima insists that the parties also agreed to a $180,000 management fee as well as reimbursement for soft costs. (NYSCEF 126, Fhima aff ¶3.) However, Fhima admitted that there were no specific terms agreed upon with respect to a management fee. (NYSCEF 169, Fhima tr 518:20-546:7.) Traube denies that the parties agreed that KTG would pay WCC a management fee. (NYSCEF 112, Traube aff ¶¶44-46, 58; NYSCEF 167, Traube tr 59:14-19.) Rather, KTG insists that Fhima did not request a management fee until around the time that WCC was terminated. (NYSCEF 112, Traube ¶44.) KTG alternatively argues that if such a fee was agreed upon, it would be due at the conclusion of a completed project, but WCC was terminated earlier. (NYSCEF 160, KTG Memo of Law on Mechanic's Lien at 3.)

Wygoda, Traube, and Traube's two partners came to an agreement on the revised plan on December 8, 2015. (NYSCEF 171, Wygoda tr 817:8-17; Exhibit 104 at J2199, proposal.) Wygoda added a roof enclosure to the scope of work. (*Id.*, Wygoda tr 817:8-17*.*) However, the roof addition was not adopted until October 4, 2016 when Ngai incorporated the change in his documents. (*Id.*, Wygoda tr 833:15-16, 846:19-847:2; Exhibit 105, 139 pages of mechanical floor plans.)

The initial scope of the project was to design a Kosher restaurant with a bar area and, up a few steps from the bar, a dining room and kitchen. (NYSCEF 171, Wygoda tr 806:19-21; Exhibit 102, August 20, 2015 proposal.) KTG's budget for the project was $1.4 million. (Exhibit 78, Budget; NYSCEF 126, Fhima aff, Exhibit A.) Traube projected that WCC would construct a restaurant from the former childcare center in 5 to 6 months. (NYSCEF 167, Traube tr 59:7-13.)

[* 8]

Wygoda corroborated Fhima's testimony that the original plan was changed by flipping the kitchen from the State Street side to the Wall Street side of the building. (NYSCEF 171, Wygoda tr 815:14-21.) An elevator was part of the original plan to accommodate ADA access from the street level to the second level; initially, it did not go to the roof. (*Id.* 840:23-841:4.) Kanakos testified to six revisions. (NYSCEF 170, Kanakos tr 719:3-4.) The tented roof was added during the last third of the job. (*Id.* 720:24-25.)

Ngai was retained in the Fall of 2015. (NYSCEF 168, Ngai tr 199: 21.) "The scope of [his] work as agreed upon in the proposal, was to frame out the opening in the roof [for] the elevator, to frame out an opening in the roof for new stairs leading into the elevator, for the [infill] of two spaces in the freight elevator that was not being used for accessible floor space, and to accommodate the first floor for a new elevator." (*Id.* at 199:24-200: 6.) Ngai's first proposal was submitted on July 21, 2015 which Traube executed on September 2, 2015. (Exhibit 106, Proposal at 2348-2351.) Ngai submitted another proposal in 2016 when KTG changed the Project to include a second staircase. (NYSCEF 168, Ngai tr 209:24-25, 348:6-10.) Ngai submitted a third proposal for remedial work dated January 3, 2017. (*Id.* at tr 210:5-7; Exhibit 20, Ngai letter at 143-146.)

Fhima testified that WCC began work on the Project in June 2015 with demolition starting in July 2015. (*Id.* at 551:23-24; NYSCEF 126, Fhima aff.) According to Fhima, his "demolition consist[ed of] breaking the concrete ramp at entrance, provide temporary ramp to access during construction, removing old mechanical equipment, removing all electrical fixtures and wiring, removing all plumbing piping from waterfalls and planters,

[* 9]

removal of plumbing pipes and venting, removal of fire alarm equipment and wiring, removal of all sprinklers pipes and disposal of all debris. All of this work is not mentioned in any plans since the architect was not hired for demolition." (NYSEF 126, Fhima aff.)

Ngai came to the Project in the Fall of 2015. (NYSCEF 168, Ngai tr 199:18-21.) "The scope of my work as agreed upon in the proposal, was to frame out the opening in the roof or in the elevator, to frame out an opening in the roof for new stairs leading into the elevator, for the infill of two spaces in the freight elevator that was not being used for accessible floor space, and to accommodate the first floor for a new elevator." (*Id.*, Ngai tr 199:24-200:6.)

WCC commenced construction work on the project in January 2016 without first presenting shop drawings to the design team as is customary. (NYSCEF 168, Ngai tr 228:3-230:18, NYSCEF 169, Fhima tr 551:25-552:2.)

Traube testified that he was at the site almost daily (NYSCEF 167, Traube tr 102:20-21, 103:5-7) which was corroborated by Kaufman as to the second part of the Project. (NYSCEF 169, Kaufman tr 471: 23-24.)

WCC hired subcontractors. For example, WCC hired Cobra to install the HVAC as per the plans for $71,500. (NYSCEF 167, Traube tr 85:23-25; NYSCEF 111, Exhibit 22, April 25, 2016 Cobra Contract.) Fhima and Corba had worked together before. (NYSCEF 110, Corba aff ¶¶17, 19.) Cobra's contract specified the model name and numbers of each unit. (*Id.*) Initial plans were drawn up by Kanakos, but it was determined to be too costly. (NYSCEF 167, Traube tr 84:6-8.) Insufficient financing was a genuine concern that paused construction for a brief period and prompted

Fhima's suggestion of a more cost-efficient HVAC models. (*Id.,* Traube tr 112:4- 8; NYSCEF 172, Corba tr 932:8-16; NYSCEF 170 Kanakos tr 723:4-7.) Fhima proposed the change to the original mechanical plans for the restaurant's HVAC system. (NYSCEF 112, Traube aff ¶29; NYSCEF 110, Corba aff ¶¶24-26; NYSCEF 167, Traube tr 83:21-88:3; NYSCEF 172, Cobra tr 932:20-933:6; 975:14-976:20; NYSCEF 171, Kanakos tr 723:13-724:4.) KTG agreed. (NYSCEF 167, Traube tr 134:21-22:15.) Kanakos revised the plans memorializing WCC's designs. (Traube at 85:11-12,19-22; 134:15-18; 163:3-5; NYSCEF 172, Corba tr 962:7-9; NYSCEF 171, Kanakos 752.) The DOB approved the revised plan. (NYSCEF 167, Traube tr 85:14-16, 134:23-24.) WCC determined the location of the HVAC units in the ceiling and the ductwork run. (NYSCEF 172, Corba tr 933:24-25, 934:2-3, 964:9-13, 983:2-4, 934:8-13.) Cobra began installation in May or August or September 2016. (NYSCEF 172, Corba tr 943:17-19; NYSCEF 110, Corba aff ¶33.) Cobra followed the plans and directives of WCC, as WCC retained Cobra. (NYSCEF 172, Corba 933:24-25, 934:2-3, 964:9-13, 983:2-4; NYSCEF 170 Kanakos 731:7-9.) Corba testified that the remaining work to be done after WCC was terminated included "we were missing one condensing unit for the five ton unit in the kitchen, we were missing the refrigeration lines and the final Punch List, the drops for the distribution of air" as well as installing refrigeration line and electrical work such as connecting the units and running thermostat wires. (NYSCEF 172, Corba tr 949:21-25, 951:9-13, 951:14-19.) Cobra's fee for this job was $75,000 of which he was paid $45,000. (NYSCEF 172, Corba tr 951:20-25.)

Traube admitted that he agreed to revise the HVAC system. (NYSCEF 167, Traube tr 85:5-22.) Traube understood that the revised HVAC plan was more cost

effective than the initial proposed HVAC plan and required the construction of a flue to the roof. (*Id.* at 94:2-11; Court Exhibit III[20] at J598 until J605.)

Corba testified that Cobra was not informed of any deficiency with the HVAC; there was never a complaint about access to units for serving. (NYSCEF 172, Cobra tr 946:23-25; 950:2-4.) Traube admitted that he never complained to Cobra about venting. (*Id.* at 136:24-137:7.) Kanakos testified that the problems identified are common and easily remediated. (NYSCEF 171, 739:18-740:2, 776:4.)

In April, 2016, Ngai visited the site and found roof beams installed without shop drawings or design team approval. (NYSCEF 168, Ngai tr 230:2-24.) WCC provided as-built drawings instead of shop drawings.[21] (Id. 231:4-9.) Ngai commented and requested additional information, but WCC failed to respond. (*Id.* at 231:25-232:3.) In April 2016, Ngai drafted a report with observations and responding to WCC's inquires, including: walls for the roof of the elevator; light gage wall instead of a steel beam; steel beams used to frame the elevator and stairs adjacent to the elevator; asking for as-built drawings to indicate the type of steel and how connected to existing beams; unexpected condition. (Exhibit 108, Report at 2545; NYSCEF 168, Ngai tr 233-235.) WCC responded with as-built drawings for the roof beam. (NYSCEF 168, Ngai tr 236:13-15.) On June 11, 2016, Ngai responded with questions about WCC's as-built drawing of the wall construction for the roof bulkhead and the framing for the first-floor stairs. (Exhibit

---

[20] The parties failed to designate exhibit numbers instead delivering 2,935 pages to the court. Accordingly, on day one of trial, the court identified exhibits entered into evidence as court exhibits. Properly designated exhibits with tabs were delivered to the court on the second day of trial.

[21] Ngai explained that "[a]s Built Drawings, are drawings that the contractor would produce, showing what exactly they built." (NYSCEF 168, Ngai tr 231:6-9.)

[* 12]

19, As-Built Drawing of roof bulkhead framing for stairs and structural steel for fraing roof from WCC with questions in red from Ngai at 137-142; NYSCF 168, Ngai Tr 267:21-270:25.)  Ngai requested more information from WCC, but none was provided. (NYSCEF 168, Ngai tr at 239:10.)

During the course of its work, WCC discovered a 16-inch slab covered with dirt where an elevator pit was to be installed.   (Exhibit 64, Inspection Reports 1 and 2 for inspections on June 2 and 27, 2016, at 614; NYSCEF 168, Ngai tr 311:16-23.)   The Special Inspector[22] probed the nonconforming slab in June 2016 and determined that the newly discovered slab consists of different thicknesses and thus slopes and reported that the slab is thicker than the new slab indicated by Ngai's design.  (Exhibit 64, Inspection Reports 1 and 2 for inspections on June 2 and 27, 2016, at 614, 618, photo #9; NYSCEF 168, Ngai tr 291:9-11; 294:9-16.)  "The base of the pit is an elevated slab which should be verified against elevator load." (Exhibit 64, Inspector Report at 614.)  At the time that the condition was reported, there was a site meeting, after which Ngai investigated to assess the condition and went underneath the slab to examine it. (NYSCEF 168, Ngai tr 295-297:16; 358:17-360:16.)   WCC proceeded with its work including pouring cement on top of the existing newly found slab as directed on the plan.  (*Id.* at 358:2-9.)  Six months later, Ngai issued a report.  (Exhibit 16, Ngai Report.) Ngai takes issue with WCC proceeding with its work instead of stopping "until the item ..

---

[22] Ngai explained that "[t]he special inspector is a third-party engineering company that checks the different aspects of the construction based on what my drawings list." (NYSCEF 168, Ngai tr 214:12-216:8; 218:25-219:15.)  The inspector was Nouredine Benabdelhac of Alanour Consulting Engineer.  (*Id.* at 285:21-24.)

[* 13]

deemed noncomform[ing] was resolved," which is the industry custom and practice.[23] (NYSCEF 168, Ngai tr at 296:21-23.) However, admittedly, Ngai did not direct WCC to stop work on the elevator. (*Id.* Ngai tr 297:18.) Six months after its discovery, Ngai recommended the installation of steel beams under the slab to address the unexpected field condition –the slab. (*Id.* at 306:4-16; 308:19-25; 316:13-18; Exhibit 16.)

At some point additional changes to the HVAC system were made to accommodate tented rooftop dining and thereby necessitating a new HVAC system. (NYSCEF 167 Traube tr 117:21-25; NYSCEF 178, COBRA Findings of Fact.) KTG insists that a tent enclosure on the rooftop for outdoor dining was part of the plan since as early as February of 2016. (Exhibit 107, Plans at 2387. 33.) The rooftop tent enclosure had its own HVAC system separate and apart from the interior units and systems, did not necessitate any change to the interior HVAC system installed by Cobra. (NYSCEF 167, Traube tr 109:8-12. 35, 117:3-122:25; NYSCEF 170, Kanakos tr 736:22-780:24. 34.)

The Special Inspector issued 9 reports.[24] In his reports 1 and 2, for inspections on June 2 and June 27, 2016 (Exhibit 64, at 612-622), the Special Inspector found nonconformities between Ngai's plans and WCC's work. (NYSCEF 168, Ngai tr 212:2-

---

[23] Kaufman corroborated that the proper protocol is "prior to anything being closed up, all inspections are made by any party, whether it is structural, electric, plumbing, fire alarm. You know, once something is closed, you don't have access to it. I get my signoff's before I close things up, all right, otherwise, you can't get your signoff's." (NYSCEF 169, Kaufman tr 476-477.)

[24] The Special Inspector issued Report 3 after a July 11, 2016 inspection. (Exhibit 64 at 623-630.) Report 4 was issued after an October 5, 2016 inspection. (*Id.* at 631-635. NYSCEF 168, Ngai tr 338:25-339:3.) Report 5 was issued after a November 3, 2016 inspection. (Exhibit 64 at 636-643.) Report 6 was issued after a November 11, 2016 inspection. (*Id.* at 644-652.) Report 7 was issued after a November 17, 2016 inspection. (*Id.* at 653-663.)

19, 330:2-14, 278:2-21.) Without remedial work, the structural design would be compromised. (NYSCEF 168, Ngai tr 213:23-24.) Typically, the contractor and the design team work together to resolve such nonconformities for which there are a variety of causes including unexpected field conditions. (NYSCEF 169 Kaufman tr 453:9-13; NYSCEF 126, Fhima aff at 3; NYSCEF 168, Ngai 296:21-23 ["Stop building until ... resolved," but that presumes that the design team responds promptly.])

Though the Special Inspector issued nine reports, Ngai received four of the reports all on the same day -- November 15, 2016. (NYSCEF 168, Ngai tr 242-246; 283:2-7; 284:19-20; 285:7-9.) Ngai is not on the distribution list for the reports. (Exhibit 64, Special Inspector Reports at 612, 623, 631, 636, 644, 653.) On December 5, 2016, Ngai issued a letter acknowledging his receipt of reports 1, 2, 3, and 5 and responding to 12 issues identified therein. (Exhibit 16, Ngai letter at 131; NYSCEF 168, Ngai tr 338:5-16.)

Traube sent his accountant Kunzler to WCC's office in Queens to audit WCC's financial records for the Project. (NYSCEF 167, Traube tr 22:18-20.) Kunzler reviewed WCC's cancelled checks and receipts which added up to $238,000 for soft costs as of September 2016. (NYSCEF 169, Fhima tr 548:16-564:14.) Fhima testified that he provided Kunzler with the documents wherein he allocated expenses to the KTG Project. (*Id.* Fhima tr 548:25-549:3.) However, Fhima's testimony concerning the details of and support for these charges was evasive, nonresponsive, and confused. (*Id.* at 547-566.) Documentary evidence showed that some of the allocations to KTG were wrong. For example, WCC bought paint in November 2015 and allocated it to the Project before construction began. (Exhibit 105, November 25, 2015 receipt; NYSCEF

[* 15]

169, Fhima tr 577:10-582:10.) Some expenses were from other projects and unrelated to KTG at the time. (NYSCEF 171, Fhima tr 911:6-912:19 [Central Park West project]; NYSCEF 126, Fhima aff at 2 [restaurant project on West 20th Street].)

KTG terminated WCC in November 2016 by which time KTG had reimbursed WCC $364,000 for labor and materials. (NYSCEF 167, Traube tr 62:16-25; NYSCEF 170, Fhima tr 624:15-625:2; NYSCEF 112, Traube aff ¶¶ 21, 24-25; NYSCEF 167, Traube tr 61:21-62:15.) KTG found WCC's work deficient, including mechanical and structural deficiencies. (See Exhibit 16, Ngai letter at 131-132; Exhibit 19, Shop Plans at 137-142; Exhibit 64, Special Inspector Reports at 612-663; Exhibit 108, Ngai Letter at 2545.) Traube implausibly testified that KTG gave WCC notice of deficiencies months prior to termination but there is no documentary support for Traube's testimony as discussed below. (NYSCEF 167, Traube tr 69:13-22.)

Fhima testified that he was terminated, not because he did not do the work, but because "[a] small budget was given to investors to attract them, salaries were drawn by partners and chefs without the knowledge of investors, construction was changed twice. Once investors were made aware of the real budget after our meeting, Traub terminated my services and decided not to pay." (NYSCEF 62, Fhima aff at 5.)

Fhima testified that the project was 85% complete when he was terminated. (NYSCEF 169, Fhima tr 579:9-580:6.) Ngai testified that the project was 60-70% complete in November 2016. (NYSCEF 168, Ngai tr 352:7-13, 289:17-290:3.) Corba testified that the HVAC system was about 80-90% completed. (NYSCEF 172, Corba tr 949:18-19; NYSCEF 110, Corba aff ¶40.) During an initial walkthrough in November 2016, Kaufman observed a project in various stages of construction which was 20-25%

complete, but Kaufman later discounted the accuracy of his estimate. (NYSCEF 169, Kaufman tr 383-384; 425:17-20.) Indeed, WCC was buying paint and began painting when the Project was 83% complete, according to Fhima which is one of the last steps in the process. (NYSCEF 169, Fhima tr 579:21- 580:6.) The court rejects WCC's assertion that the project was 85% complete because it took $500,000 for GAR to complete the project consistent with the same plans amended only to add the tented roof, before consideration of the corrections necessitated by WCC's deficient work. However, the court entirely rejects Traube's testimony that the restaurant was 30 to 40 percent complete. Traub incredibly testified that "[i]t was a very raw space, no floors, no walls, barely any ceilings. I don't even think any ceilings, were put in. There was no working air conditioning, the kitchen wasn't installed yet. It was basically a raw space." (NYSCEF 167, Traube tr 64:6-15.) Yet Traube also complained that KTG was compelled to tear down walls installed by WCC. (NYSCEF 167, Traube tr 64:10-12.) Traube's testimony is also overwhelmingly contradicted by the photos in evidence, exhibits and testimony all of which show that WCC. (Inspection Report 8, photos at 638-643.)

In December 2016, Ngai emailed the architect and KTG responding to a prior email suggesting that he was "beginning to sour on the Project." (Exhibit 105, email at 2205; NYSCEF 168, Ngai tr 272:12-274:4.) In his email, Ngai declared that the Project was "either dangerous or not in conformance with the New York City Building Code." (NYSCEF 168, Ngai tr 273:7-15.)

In December 2016, KTG hired GAR to finish the Project. (NYSCEF 112, Traube aff ¶26; NYSCEF 167, Traube tr 97:9-98:23; NYSCEF 169, Kaufman tr 375:15-378:19.)

GAR's Kaufman testified that the initial quote of $501,865 was for the remaining work to complete the Project pursuant to the architectural plans from the point at which WCC departed the Project not including any corrective work. (NYSCEF 170, Kaufman tr 427:2-4.) In the written signed contract, KTG and GAR agreed to a price of $502,865. (Exhibit 35, 36, 37, 38, GAR contracts with KTG §4.1 at 275.)

On his initial walk though, Kaufman had concerns about the completed steel work and ventilation system. (NYSCEF 167, Kaufman tr 386:8-23.) Subsequently, GAR investigated the HVAC system and found it to be contrary to code, not properly vented, absent any access point for repair or service and not functional for the space it occupied. (Exhibit 1, Kaufman email, at 1-2; Exhibit 2, Kaufman email at 3; NYSCEF 112, Traube aff ¶¶11, 27; NYSCEF 167, Traube tr 85:2-88:3; NYSCEF 169 Kaufman tr 385: 23-386:19; 392:10-11, 403:11-407:16; 458:17- 466:20; 474:5-480:19; NYSCEF 168, Ngai tr 209:10-219:25.)

On January 19, 2017, Ngai wrote to KTG and explained why exploratory probes were necessary to expedite the remedial work. (Exhibit 17, Ngai letter, at 133-134; NYSCEF 168, Ngai tr 249; 340.) By the time that Ngai requested the probes, WCC had already installed sheetrock and architectural finishes covering structural elements. (*Id.* Ngai tr 219:16-25.) Ngai's requested probes began in January and continued to March 2017. (*Id.* Ngai tr at 349:18-24; 350:6-10; 251:14-16.)

On February 7, 2017, Ngai issued a letter documenting his observations of the initial probes. (Exhibit 18, Ngai Letter at 135-136; 256-264.) GAR responded by email to KTG on February 7, 2017, proposing solutions. (Exhibit 1, email.) Remediation was necessary to satisfy Ngai who would not sign off on the Project without it. (NYSCEF

169, Kaufman tr 412:11-13.)

Ngai, GAR and the architect came to an agreement as to what work needed to be done; these negotiations took about 6 to 8 weeks beginning in March 2017. (*Id.* Kaufman tr 409:3-10.) According to Kaufman, it took another 3 to 4 weeks to remediate. (*Id.* at 409:8-10.) Ngai estimated that the process of investigating and remediating WCC's work took eight months. (NYSCEF 168, Ngai tr 355:5.)

Kaufman identified the following problems with WCC's work.

## Problems with the HVAC

"The first section, those five points, refer to the area where you first walk into the restaurant, which was the bar area. I had told them that that unit needs to be moved so that it can be serviced. It had what's called a furnace, which is actually a gas furnace built into the unit itself. We said that we have to remove the gas furnace because there was no real proper way to vent that unit for carbon monoxide. The duct work needed to be modified and reconnected to the unit in its new location and a heating coil with an actuator, needed to be installed. We were going to use hot water to go ahead and produce the heat instead of a furnace. In addition, an economizer needed to be installed. There was an existing louver that we were going to use for both exhaust and fresh air, that was in the front of the restaurant. So, we wanted to put the economizer, in, as well. Thermostats, and controls, I think, that is self explanatory. And, then, replace refrigeration piping to the rooftop condenser units. You know, air conditioning systems are broken up into two units, you have a blower and condenser. You know, you have part inside, part outside, so, we had to run piping up to it. And, then, additional outlets and branch duct work for, you know, it is called tap and boost, all right, for the front bar area. The rear unit, there was nothing that we could do with it in that area, so, we had proposed to supply and install an eight ton system with multiple air headers, again, with hot water coils, all right, use the existing flue. Even though it was pitched incorrectly for exhaust, we were able to utilize that for outside air. And, there was additional duct work and outlets that had to be provided for that, for there. The kitchen, we had proposed installing a condenser unit again with an actuator, for the conditioning of the air in the kitchen, and, then we had -- we were hoping that we were able to use the existing units from the rear of the first floor and install it on the rooftop, and, again, hot water coils, actuators, duct work, etcetera. The condensing units that were up on the roof needed also to be repositioned again so that they were serviceable, and, there needed to be exhaust for the bathrooms. And those exhausts needed the fire dampers in them as well. And we had provided a cost for shop drawings that the mechanical engineer had asked us to submit to him."

(NYSCEF 169, Kaufman tr 404:17-406:17.)

In a March 2, 2017 email to KTG, Kaufman reported his final findings about the air conditioning units.  The conclusion was that the system will not work and was installed improperly.  (Exhibit 2, Kaufman email; NYSCEF 169, Kaufman tr 397:2-3.

## Problems with the windows

"The windows were not air sealed, they were just -- there was just some weather proofing put in around them, so, we had to air seal the windows, which is an energy code requirement."

(NYSCEF 169, Kaufman tr 413:17-20.)

Upon opening the ceiling, Kaufman found five-gallon buckets to capture the water leaking from the roof and windows.  (*Id.*, Kauman tr 392:5-9; 394:6-13.)

## Problems with Subflooring

"He -- the original contractor -- had used regular plywood as a sub floor; something we were uncomfortable with, and the architect of record as well as the structural engineer agreed, that besides being illegal, it was not sufficient. So we had installed a fire rating sub floor. We used a product called Dragon Board, and we gave them the manufacturer specification sheet, which is referred to as Tax Cut Sheet."  (NYSCEF 169, tr 413:2-9.)  "there was a concern that they were not installed properly. So, Carey, had us go ahead and install additional bracing, all right. This is one item that both the structural as well as the Special Inspector, were both -- there was a cross on both of them on this, that -- they both had to certify this. So, this is one that they were both in agreement on. There were roof penetrations that were made that were constantly leaking, so, we had to repair and seal those penetrations to stop the leaks within the facility. There was -- there were on the roof level -- there were floor drains that were put in. These floor drains required four inch pipe. They were using two inch pipe tied into a four inch, and, that is a code requirement. So, this is another one that we had to do. On the elevator rails, once it was discovered that there was no rebar and they were not solid filled, there was a whole conversation as to how we are going to go ahead and support the rails. The rails are what the elevator rides on. Short of ripping down this structure, we had agreed to install tubular steel, in order to compensate for the lack of rebar and solid fill. The bulkhead bracing was -- again, that was one of the one[]s that we had discussed prior -- after we had put in the headers, you know, we had to install bracing to keep everything square and assembled.  So, the front stairs, there were no shop drawings submitted

[* 20]

prior to those stairs being installed, so, we had to install three inch steel plate, which satisfied the structural engineer that they were stable and he would signoff on them."

(NYSCEF 169, Kaufman tr 413:11-17; 413:20-414:14; 414:20-414:24)

## Problems with the Bulkhead Lintels

"There were headers in all the bulkhead doors that were missing, so, it was just light gauge steel that was up there that served no structural purpose. There was steel cut in the Elevator Mechanical Room on the roof that was cut without the knowledge of the structural engineer. He wanted new support columns in there to compensate for this. The existing equipment, you know, -- the existing exhaust equipment -- that was on the bulkhead was just placed on the roof and the structural engineer felt that it couldn't handle that load, so, he had us install additional steel dunnage, which was just framework for equipment to sit on top of. The front stair support columns were just sitting on the ground where they should have been set into a slab, so, the structural engineer had agreed to allow us to set them with epoxy ground bolts rather than rip down the entire stairs. The rear stairs, the length of the stairs was more than 12 feet. It was installed as one continuous stair. The code states that you cannot have more than 12 feet without a platform or a landing, all right. In order to accommodate this, we he had to extend the existing bulkhead and add three new platforms so that no section of the stair would be more than 12 feet."

(NYSCEF 169, Kaufman tr 414:24-415:24.)

## Problems with the Wall with no Bracing

"So, there was one wall, specifically, that was of concern, and that was the only one we did bracing with. On the front stairs, which takes you from the main dining room to the roof, it is, approximately, about 20 to 22 feet in height from base to top, and, we opened up the walls. There was no bracing installed on these walls initially.
Q Okay. What's the area of this wall?
A Square footage?
Q Yes. A Okay. Approximately, 20 feet high, approximately, eight feet wide, 160 square feet. A Okay, so these beams were set 16 inches on center, and there were three rows of bracing put in, approximately, every six feet.
Q Right. So, these braces, are they basically steel studs, that are cut and then screwed in between the beams?
A So, they were not happy with light gauge steel, they wanted mild gauge steel. So, it is a steel product that is put in.
Q How long did that take to do that to install these?
A So, between ripping down all the sheetrock that was on there, taking out the insulation, the steel, I would say, probably, what I remember, a day-and-a-half,

two days."

(NYSCEF 169, Kaufman tr 435:2-436:5.)

KTG relies on three change orders in support of its damage claim for $365,000. The first change order is dated March 20, 2017 and is between the owner, listed as Steven Vegh,[25] and the contractor GAR. (Exhibit 38, Change Order #1 at 378-379.) It describes inspections necessary to check WCC's work. (*Id.* ¶1, 2, 3, 8, 9, and 10.) It also includes a correction to WCC's work: "13. Supply and install 12" x 12" x ½" steel shear tabs to be welded to existing new steel incorrectly installed by the previous contractor." (*Id.* ¶13.) The first change order totals $15,600, but the costs are not broken down per task. (*Id.* at 379.)

Change order 2 is dated March 20, 2017 and is between Vegh and GAR. (Exhibit 38, Change Order 2 at 380-381.) It totals $280,800 and includes costs for each of 11 tasks. (*Id.*) However, Traube testified that the rooftop expense of $48,000 was never incurred. (NYSCEF 167, Traube tr 120:8-12.) Except for the last expense of $12,000 for shop drawings and as-built drawings, the tasks concern the HVAC system. For example, under "Condensing Units", "1. The existing units need to [be] repositioned for service as the way they are now are not serviceable. Additionally, they need support rails. COST $6,000." (Exhibit 38, Change Order 2 at 381.)

Change order 3 is dated May 21, 2018 and is between owner Veigh and contractor GAR. (Exhibit 38, Change Order 3 at 383-385.) It totals $116,900 for 19 tasks, but there is no cost per task. (*Id.*) Some of the items (1, 2, 4, 13, and 14) are to

---

[25] Steven Vegh was an investor who came to the Project in October 2016. (NYSCEF 126, Fhima aff at 5; NYSCEF 167 Traube 56:22-57:3.)

[* 22]

correct WCC's work. For example, "1. Supply and install additional steel for roof deck as additional cement was poured by previous contract[or]." "2. Supply and install additional supports, cross bracing and cement slab to correct inadequate installed sub flooring system in entry/bar area." (*Id.*) "12. Supply and install 3/8" steel plate for front interior stairs. This was necessitated since no shop drawings design / construction drawings were submitted."

The project experienced financial difficulties. (NYSCEF 167, Traube tr 56:23-57:4.) Indeed, Traube's interest in the project was reduced from 25 to 5% "because funds were needed to finish the project." (NYSCEF 167, Traube tr 56:12-57:4.) Vegh was brought in as a new investor on the Project. Traube admitted that the project was delayed for 1 month due to financing issues. (*Id.* at 112:4-8.) He also admitted that he asked WCC to pay the interior designer on October 10, 2016 because "we were experiencing hesitancy by the investors to more money to Isaac" and he claimed that WCC had excess funds from the $50,000 KTG gave WCC to begin the Project in January 2016. (*Id.* at 184:23-25.)

**Traube is not Credible**

The court found Traube not credible because he was evasive, he contradicted himself repeatedly and was contradicted by the credible record. For example, Traube contradicted his own affirmative answer to the question whether any of the contractors on his 17 prior restaurant projects had been paid for labor and materials and nothing more. (*Id.* at 52:6-53:17). Traube testified that WCC agreed to work on a cost basis meaning that WCC would be paid the cost of labor and materials only because WCC's

Fhima was a friend. (*Id.* at 58:21-59:3; 59:20-22.)[26] The court rejects KTG's expectation that WWC would renovate this restaurant without any compensation as not credible. Further, Traube's expectation that WCC would transform a former childcare center into a restaurant in 5 to 6 months and without any compensation was not credible. (NYSCEF 167, Traube tr 59:7-13.) The 5 to 6 month projection would be naive except that Traube has been engaged in 17 prior restaurant renovations.

Traube's testimony about Change Order 1 (Exhibit 38 at 378) and whether it included exploration and remediation best illustrates his evasiveness. (NYSCEF 167, Traube tr 105:16-106:18.) He responded "No" that it did not include all of the remediation, but that was not the question. (*Id.*) Moreover, the document speaks for itself; it clearly includes exploration and remediation. (*Id.* at 105:16-106:14; Exhibit 38., Change Order) Yet another example of his evasiveness was Traube's testimony that he did not terminate WCC which is also contradicted by the credible record. (*Id.* at 61:14-62:14.)

KTG suffered from financial difficulties. Traube's testimony otherwise undermines his credibility. Traube's explanation that he asked WCC to pay the designer because he thought WCC had funds remaining from $50,000 KTG gave to WCC at the beginning of the Project, was unbelievable because significant construction work had been underway for ten months. Rather, Fhima's explanation of KTG's financial difficulties is more realistic and supported by this payment and other payments

---

[26] Fhima's testimony that he expected to receive a share of the restaurant and/or receive a management fee is more realistic, but such consideration for the contract is rejected for other reasons supra. (NYSCEF 169, Fhima tr 495-531, 538:18-546:7; NYSCEF 126, Fhima aff at 2.)

WCC made to KTG because it was suffering from financial difficulties. (NYSCEF 175, payments to KTG at 1 of Exhibit A to WCCC's Findings of Fact at 5/21.[27])

Traube's testimony is unreliable because he exaggerates. Traube testified that at the time of WCC's termination the project was 30-40% complete. (NYSCEF 167, Traube tr at 63:3-4.) However, his testimony was contrary in that WCC had performed demolition, broke concrete to make openings for two staircases and an elevator shaft, constructed 3 bulkheads, installed steel, installed a wall in the kitchen and an elevator shaft, installed 3 multi-ton HVAC units inside. (*Id.* at 64:16-65:19; 66:8-13; 66:20-67:15; 68:12-16; 71:6-8; 86:16-88:21.) It was further undermined by the interior designer Peta Gaye who was emailing one month before WCC was terminated asking to be paid so she could begin to address items that "need immediate attention" including "working out first floor details on site" and "Second floor construction drawings, second floor lighting plans, second floor material selection." (Exhibit 82, October 10, 2016 email at 1560.) Traube insisted that the interior designer needed immediate attention only because of the long lead times to order materials not because the project was progressing significantly. (183:12-184:10.) The court found Traube's testimony self-serving and thus unreliable.

Traube's testimony was undermined by many questions he was unable to answer, but he should have been able to answer. Though Traube oversaw this project and was on site "almost every day," he did not know who paid for the demolition, for example. (NYSCEF 167, Traube tr 64:21-65:25.) He did not know who paid for the HVAC, though later was certain that the landlord paid for the HVAC units installed by

---

[27] NYSCEF pagination.

[* 25]

Cobra. (*Id.* at 180:23-181:13; 84:12-14.) Traube complained about the roof leaking and testified that he paid WCC for labor and materials to waterproof, yet he did not know who the roof subcontractor was even though he was on site daily. (NYSCEF 167, Traube tr 109:19-110:19; 102:20-24.) This testimony was equivocal when Traube should have been certain given Traube's position and time on site.

Likewise, KTG's objection that WCC was absent from the job site, was not diligent, did poor quality work, failed to supervise subcontractors, and failed to keep KTG informed is undermined by Traube's testimony that he was on the job site daily. (NYSCEF 112, Traube aff ¶¶ 11, 22, 24.) Indeed, Traube watched WCC close a wall about which KTG now complains. (NYSCEF 167, Traube tr 151:2-17.)

Another example of Traube's unreliable testimony is Traube's admission that initially, an enclosed roof was not part of the plan. (*Id.* Traube tr 72:7-10; 84:19-25.) Wygoda, the architect, corroborated that the plan changed to add a tented roof. (NYSCEF 171, Wygoda tr 815:14-21.) Further, Traube was evasive in answering questions about the installation of three indoor air handlers and the HVAC needed for the modified roof. (NYSCEF 167, Traube tr 86:2-87:22; 88:6-20.) However, GAR's Kaufman testified that the Economizer $19,200, Thermostat controls $4,800, Refrigeration piping $9,600, Condensing unit kitchen $16,800 were all new additions to HVAC system and were not installed to remedy WCC's deficient work. (NYSCEF 169, Kaufman tr 96-103; Exhibit 38 at 380-381.)

Traube's testifimony to lack of knowledge concerning construction, and this project in particular, which was inconsistent with his years of experience renovating restaurants and his daily visits to this Project. For example, Traube did not know what

[* 26]

**Page 26 of**

cross bracing is. (NYSCEF 167, Traube tr 152:18-19.) Traube also testified that he had "no idea" of the identity of the independent inspector. (*Id.* at 158:25-159:2.) While Traube testified that he did not know what soft costs are (*Id.* at 145:2-3), he later admitted that the Project's "budget" included $200,000 for soft costs. (*Id.* at 176:6-177:7.) In his September 2016 report, in the form of a spreadsheet, which Traube received, Kunzler, included a list of soft costs e.g. salary, insurance, parking cards, rent, etc. totaling $238,000. (*Id.* at 75:17-18; 172:4-12; 551:15; exhibit 78 at 1369,1372; NYSCEF 169, Fhima tr 548:16-564:14.)

The court rejects KTG's assertion that WCC wasted time on the Project. First, Traube's credibility was undermined by his testimony that he started complaining about WCC's timeliness from day 1. (*Id.* at 112:12-13.) He insisted that such complaints were by email. (*Id.* at 112:18-113:6.) When faced with the absence of any emails discussing timeliness issues, he explained that Fhima was a friend so he would not put such complaints in email, he would have told him in person. (*Id.* at 113:7-15.) Alternatively, Traube testified he would have texted complaints to Fhima, but KTG failed to produce his texts. (*Id.* at 113:20-114:6.) Such testimony is incredible in light of the constant communication by email and volume of emails. (See 8 binders, 122 exhibits, 2,935 pages.) Moreover, Traube overlooks other explanations for delays. For example, Wygoda testified that permits must be issued before construction could begin. (NYSCEF 171, Wygoda tr 850:20-25.) Fhima testified there were no permits as of July 2015. (*Id.* Fhima aff at 3.) [28]

---

[28]KTG implies that WCC closed walls to hide improper nonconforming work. (NYSCEF 167, Traube tr 151:2-17; NYSCEF 168, Ngai 217:11-18, 219:16-25, 240:19-21.) However, the failure to timely deliver the Special Inspector Reports to Ngai and

Therefore, the court finds Traube unreliable.

**Fhima**

The court finds that Fhima's testimony is not reliable because he was often nonresponsive and his record keeping was chaotic making his testimony equally chaotic and meaningless. Fhima could not match up invoices for materials and payments of those invoices. (See e.g. NYSCEF 171, Fhima tr 878:3-881.) For example, since WCC failed to produce some American Express statements, the only evidence of payment was Fhima's testimony that the bills were paid by WCC which the court finds unrreliable. (*Id.* Fhima tr 890:15-892:7.) Fhima identified checks that were offered into evidence but were not KTG's expenses. (*Id.* 903:12-904:23.) Fhima testified that he has many credit cards and he was unclear as to whether one may or may not be a WCC company card. (*Id.* 905:15-908:16, 909:7-910:22.) It appeared to the court that Fhima was confused by having so many credit cards. Indeed, the court observed that Fhima seemed surprised by a Bank of America card. (NYSCEF 171, Fhima tr 910:3-20.) As an example, of Fhima's evasiveness, see his testimony regarding the relationship of Yacot[29] to WCC and this Project, if any, and who would be paid the $180,000 management fee. (NYSCEF 169, Fhima tr 495:23-531:17.) Finally, Fhima's testimony that the work was 85% done and WCC was simply waiting for inspections was undermined by the fact that WCC had closed walls making inspection impossible. Therefore, to the extent Fhima's

---

Ngai's tardiness in issuing reports and comments once he did receive the reports cannot be overlooked. Indeed, Ngai testified that he is to respond to notice of nonconformance in days. (NYSCEF 168, Ngai tr 220:7-20.)

[29] Fhima testified that he and his mother established Yacot to take advantage of certain benefits awarded to women-owned business. (NYSCEF 169, Fhima tr 503:18-504:12.)

[* 28]

actually answered a question, the testimony was generally unreliable.

**Other Witnesses**

The court found the other witnesses fair and balanced. As nonparties, they had no interest in shading their testimony for or against either party. The court observed that Ngai testified credibly. He thought before responding and was not afraid to testify that he did not know an answer. He stood his ground on cross examination. Kanakos calmly responded to questions and testified honestly when he did not know an answer. The testimony of nonparties is at the heart of this decision.

**Findings**

**KTG's Claim Against Defendants**

KTG is entitled to reimbursement for the costs of inspecting and remedying because of the poor quality of defendants' work. The Special Inspector's Reports are a reliable assessment of defendants' work. Fhima challenges the Special Inspector's report because it is dated December 2, 2016 after WCC was terminated. (Exhibit 64.) However, GAR was not on the job until December 16, 2016. Accordingly, the omissions identified by the Special Inspector, are defendants' omissions. Fhima complains he should have been given an opportunity to cure the problem as is customary. However, in the instances where defendants closed walls by installing sheet rock, it cannot be said that defendants were waiting for inspections or further instruction. For example, Fhima admitted that he could have easily added another stud as required by the plan but put up the wall instead. (NYSCEF 169, Fhima tr 591:21-592:11.) With regard to the studs on the door openings, which Ngai identified as a life safety issue, Fhima demeaned the observation saying it "is not going to make a difference." Fhima claimed

that the Special Inspector was using a plan that was never sent to WCC, but there is no such proof in the record. (*Id.* at 591:5-7.)

Based on Kaufman's testimony, the court finds that WCC did not follow proper protocol and closed up walls before the work could be inspected or problems identified by the Special Inspector could be resolved. (See NYSCEF 169, Kaufman tr 476-477, 475:22-477:2; NYSCEF 168, Ngai tr 219:16-25; 349:11-351:25.)

> "Question: In the field of acting as a general contractor, is it common for these types of changes to be made during the progression of a job as conditions change?
> Answer: It is common when you are installing steel, based on site conditions that there are changes made. It is not common that these changes are made after slabs are poured or existing slabs are there." (NYSCEF 169, Kaufman tr 449:14-20.)

> "I can tell you that I don't know how you can cure something that's not visible." (*Id.* at 453:19-20.)

Therefore, the court rejects WCC's argument that it was not given an opportunity to cure. (*Id.* 454:11-12.)

The court finds that it took months to investigate defendants' work and to remedy it, which delayed the project and delayed the opening of the restaurant, all at cost to KTG. Investigation confirmed the existence of structural defects which compromised the structure's design and integrity and presented life safety issues. (Exhibit 18 at 135-136; NYSCEF 168, Ngai tr 209:10-213:24; 255:3-264:12.) Ngai would not sign off on the project unless the structural defects were remedied which included redoing the unlicensed steel welding work so that it would be code compliant. (*Id.* at 214:22-215:3; NYSCEF 169, Kaufman tr 412:11-13, 475:22-477:2.) However, it was defendants' poor workmanship that created the problem. Therefore, WCC is responsible for KTG's investigation and repair costs.

[* 30]

**Defendants' Counterclaims Against KTG**

Defendants are entitled to be reimbursed for the expenses they incurred on behalf of KTG, but nothing more.   Fhima's assertion of work in exchange for a percentage of the restaurant is rejected.  First, defendants did not assert a claim for shares in their counterclaim and thus it is not properly before the court.  Second, the purported agreement was made by Traube and Fhima, not WCC or KTG.  (NYSCEF 169, Fhima tr 534:23-536; 538:10-540:3.)  Neither Traube not Fhima are a party to this action.  Moreover, there was no meeting of the minds as to number of shares or time when shares would transfer to Fhima.  (*Id.* at 537:5-6; 540:10-542:6; 544:20-545:546:7.)

Defendants are seeking reimbursement for soft costs including office rent, insurance premiums, salary, and a management fee.  (NYSCEF 169, Fhima tr 511:3-514:12; 547:12-566:21.)  The court finds that Traube was knowledgeable about soft costs generally and specifically on this project.  KTG is responsible for reimbursement of the actual amount of soft costs because Traube admitted to budgeting $200,000 for such costs.

The court finds that Fhima incorrectly allocated expenses from his other projects to KTG's project.  Since WCC's records are disorganized, the court cannot determine with precision the amount of incorrect charges.  Therefore, the court deducts such amounts if proven at trial from defendants' requested amount of $714,950.56.

Defendants are not entitled to a $180,000 management fee because there was no evidence of a meeting of the minds as to the terms of such an agreement.

Therefore, defendants' request for reimbursement of labor and materials expenses is granted in part.  Accordingly, defendants' damages are $263,608.31 which

[* 31]

is calculated beginning with $714,950.56 - $9,000 (J&F electrical mathematical error $32,000- $23,000) - $24,500 (due Cobra for outstanding account payable for subcontractors[30]) - $24,500 (amount owing to Cobra is listed twice at 12/27 and 24/27) - $4,355 - $5,300 - $4,355 - $5,300 (amount owing to Seoul Glass is counted twice at 13/27 and 24/27) - $127.05 (Janovic check 2735, but no exhibit) - $1,800 - $1,275 (misc supplies, but no proof of payment exhibit number) - $2,403.37 (doors Exhibit 1159 and 1456 but no proof of payment exhibit number) - $2,400 (Skylight but no proof of payment exhibit) - $200 (PCI Contracting cash for which there is no proof of payment) - $1,826.83 (October 13, 2016 Dykes Lumber for which there is no proof of payment exhibit number) = $627,608.31. When KTG's payment of $364,000 is deducted, the remaining amount owed to WCC is $263,608.31.

**Defendants' Third-Party Claim Against Cobra.**

Defendants' claim against Cobra is dismissed. As to the HVAC, the court finds that the original planned HVAC system was modified by the MEP engineer and approved by the DOB and KTG. KTG agreed to it because it saved money: two air handlers instead of three. The MEP engineer did not like it, but he modified his plans which the DOB approved. After termination, WCC and Cobra were informed about access panel issues, but they were not given an opportunity to fix it. Subsequently,

---

[30] Cobra was paid. There is no account payable because it did not finish the job. Corba testified that Cobra was paid $45,000 while Fhima claims to have paid Cobra $50,000. (NYSCEF 172, Corba tr 951:20-952:5.) Corba also claims that KTG paid a portion of the $45,000, but Fhima has checks to Cobra summing to $50,000. Oddly, check 1450 for $25,000 is dated December 24, 2015 (exhibit 694), but Cobra did not begin work until May 2016. (NYSCEF 110, Corba aff ¶33; NYSCEF 111, Cobra's April 25, 2016 contract.) In any casse, damages awarded to defendants include reimbursement of defendants' payments of $50,000 to Cobra.

[* 32]

GAR substituted for WCC and the plan changed regarding the roof which required a new system. The system installed by Cobra was not deficient and could have been fixed. Rather, KTG's modifications to the plan rendered the HVAC installed by Cobra obsolete.

The court rejects Traube's testimony that Kanakos, the licensed MEB engineer, would sign anything. (NYSCEF 167, Traube tr 123:19-125:5.) First, Kanakos testified credibly and demonstrated professionalism and integrity. Traube's disparagement of Kanakos's integrity does not change the fact that Traube signed off on the change. The court rejects Traube's testimony that Fhima singlehandedly revised the HVAC plan; the mechanical engineer is responsible for the HVAC system and seeking DOB approval. (*Id.* at 85:11-12, 19-22; 134:15-18; NYSCEF 169, Kaufman tr 469:6-13, 14-16; NYSCEF 172, Cobra tr 962:7-9.) Traube's disrespect for his own engineer only diminishes Traube's already less than credible testimony. The third-party action against COBRA is dismissed.

### Lien Not Willfully Exaggerated

WCC filed the Lien in January of 2017 for $868,145. (Exhibit J21-24.) KTG insists that the amount of WCC's lien is false and should be vacated.

Lien Law § 3 provides, that "a party who performs labor or furnishes materials for the improvement of real property with the consent or at the request of the owner thereof, or of his agent, contractor or subcontractor . . . shall have a lien for the principal and interest, of the value, or the agreed price, of such labor." (Lien Law § 3.).

Lien Law § 39[31] authorizes the court to declare a lien void if a lienor willfully exaggerates the amount stated in his notice of lien, then no recovery is allowed. (*Northe Group, Inc. v Spread NYC, LLC*, 88 AD3d 557 [1st Dept. 2011] [dismissing plaintiff's claim under Lien Law § 39, as the evidence established that the amount of the lien was willfully exaggerated].) Lien Law § 39-a [32] provides for a penalty against a lienor who exaggerates the amount of the lien including voiding the lien, attorneys' fees, and the difference between the amount claimed and the actual amount due. (*Guzman v Estate of Fluker*, 226 AD2d at 678.) If no exaggeration is intended, an inaccuracy in the amount of a lien, will not void a mechanic's lien. (*Blair v Ferris*, 150 AD3d 1365, 1371-1372 (3rd Dept 2017].)

Lien Law § 19 (6), provides that a Mechanic's Lien may be discharged "where it appears from the face of the notice of lien that the claimant has no valid lien by reason of the character of the labor or materials furnished and for which a lien is claimed.

---

[31] § 39. Lien Willfully Exaggerated is Void In any action or proceeding to enforce a mechanic's lien upon a private or public improvement or in which the validity of the lien is an issue, if the court shall find that a lienor has wilfully exaggerated the amount for which he claims a lien as stated in his notice of lien, his lien shall be declared to be void and no recovery shall be had thereon. No such lienor shall have a right to file any other or further lien for the same claim. A second or subsequent lien filed in contravention of this section may be vacated upon application to the court on two days' notice.

[32] § 39-a. Liability of Lienor Where Lien Has Been Declared Void on Account of Willful Exaggeration Where in any action or proceeding to enforce a mechanic's lien upon a private or public improvement the court shall have declared said lien to be void on account of wilful exaggeration the person filing such notice of lien shall be liable in damages to the owner or contractor. The damages which said owner or contractor shall be entitled to recover, shall include the amount of any premium for a bond given to obtain the discharge of the lien or the interest on any money deposited for the purpose of discharging the lien, reasonable attorney's fees for services in securing the discharge of the lien, and an amount equal to the difference by which the amount claimed to be due or to become due as stated in the notice of lien exceeded the amount actually due or to become due thereon.

[* 34]

Thus, if only some of the items listed are lienable, there is no facial defect.  Rather, in the absence of a facial defect, "any dispute regarding the validity of the lien must await trial." (*Dernber Constr. Corp. v. P & R Elec.Corp.*, 76 AD2d 540 [2nd Dept. 1980]).  There is no question here that defendants provided lienable services, but there is no facial defect.

While the court finds that the parties did not come to an agreement as to the $180,000 management fee, the court cannot find that Fhima's inclusion of the fee was an exaggeration.  Fhima testified credibly that he believed he was owed such a fee.  Traube disputed that the parties had such an agreement.  This is a dispute, not an exaggeration.  Moreover, KTG fails to provide any law suggesting that a management fee cannot be liened.  Indeed, construction supervision or superintending is the type of labor covered by the Lien Law.  (*Goldberger-Raabin, Inc. v 74 Second Ave. Corp.*, 252 NY 336, 343 [1929].)

KTG objects to the lien to the extent it includes plumbing and electrical fees.  The lien lists labor performed by "Electrician, Structural, Carpentry, Plumbing, HVAC, Installed Fire Alarm, Installed Elevator Shaft, and Stairs to Build a New Restaurant on Two Levels." (NYSCEF 161, Lien ¶ 5).  However, the amount defendants seek is $38,000 and $23,000[33] for the plumbing and electrical work based on defendants' payments to these professionals, not for funds owed to them.  Likewise, the court rejects KTG's reliance on lien waivers from the plumber and electrician because defendants seek reimbursement for amounts defendants paid to them, not amounts

---

[33] The court notes a mathematical error on WCC's chart at 12/47 (NYSCF pagination) for J&F Electrical which sums to $23,000 not $32,000.  (NYSCEF 175, WCC Findings of Fact.)  The subcategory additions are otherwise correct.

owing to them. (NYSCEF 165, Lien Waivers.) Therefore, the court rejects KTG's argument against reimbursing defendants for these expenses.

KTG argues that the lien is exaggerated because the lien is on behalf of only WCC, but some of the lien amounts were paid by Yacot, Fhima, or IFE, not WCC. KTG asserts that the payments made by WCC only sum to $237,242.86, which is significantly below the amount of the lien which proves exaggeration. (NYSCEF 164, KTG's Calculation.) However, KTG brought Yacot into this transaction. In the complaint, KTG alleges that "KTG and YACOT agreed to performance of portions of the Work by YACOT and that the Work would be completed in accordance with the plans, specifications and structural drawings provided to WORLD CLASS." (NYSCEF 1, Complaint ¶12.) Further, KTG paid Yacot $76,000. Finally, neither party provides any authority for the proposition that a contractor may or may not lien amounts paid to a project's subcontractors and for materials by its principal, subsidiaries or related companies. In the absence of any law, and the abundance of evidence in the form of checks and credit card payments on behalf of KTG by Fhima, Yacot, or IFE, the court rejects KTG's argument. By agreement with KTG, WCC, not Fhima, Yacot or IFE, was responsible for the labor and materials expenses at issue here. That Fhima drew upon his other entities for funds to pay KTG's expenses for which WCC was responsible, is between Fhima and his business associates. Indeed, neither Fhima, individually, nor his related entity that funded WCC, assert a claim for unjust enrichment or quantum meruit against KTG because WCC has the initial obligation to pay KTG's labor and materials.

Finally, the court finds that Fhima did not intentionally exaggerate the lien. He is

[* 36]

simply a bad record keeper.

Having found that the lien is not exaggerated, KTG is not entitled to attorneys' fees under Lien Law §39-a. In the absence of a statute or contract indicating otherwise, neither party is entitled to attorneys' fees.

Accordingly, it is

ORDERED that the Clerk of the Court is directed to enter judgment in favor of plaintiff KTG Hospitality, LLC and against defendants World Class Construction, Inc. and Yacot Management Inc. in the amount of $144,500, together with interest at the statutory rate per annum from the date of May 21, 2018 (the date of Change Order 3) until the date of the decision and order on this motion, and thereafter at the statutory rate, as calculated by the Clerk, together with costs and disbursements to be taxed by the Clerk upon submission of an appropriate bill of costs; and it is further

ORDERED that the Clerk of the Court is directed to enter judgment in favor of defendants World Class Construction and Yacot Management Inc. and against plaintiff KTG Hospitality, LLC in the amount of $263,608.31 together with interest at the statutory rate per annum from the date of November 1, 2016 (the date of termination) until the date of the decision and order on this motion, and thereafter at the statutory rate, as calculated by the Clerk, together with costs and disbursements to be taxed by the Clerk upon submission of an appropriate bill of costs; and it is further

ORDERED that KTG's request to vacate or reduce the lien and penalize defendants due to willful exaggeration is denied; and it is further

ORDERED that the third-party action against defendant Cobra Kitchen and Ventilation, Inc. is dismissed in its entirety as against this defendant, with costs and

disbursements to this defendant as taxed by the Clerk of the Court, and the Clerk is

directed to enter judgment accordingly in favor of this defendant.

2024092314357AMASLEYD7212356942C49D0B42A407695FAA317

DATE: **8/23/2024**

**ANDREA MASLEY, JSC**

**Check One:**      **x**  **Case Disposed**      ☐  **Non-Final Disposition**

**Check if Appropriate:**  ☐  **Other (Specify** _____ **)**